UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

MATTHEW T. DENHOLM, Regional Director
of the Ninth Region of the National Labor
Relations Board, for and on behalf of the
NATIONAL LABOR RELATIONS BOARD

                    Petitioner

            **v.**                                             Civil No.

OHIO RIVER VALLEY
ENVIRONMENTAL COALITION, INC.

                    Respondent

## MEMORANDUM IN SUPPORT OF PETITION FOR INJUNCTIVE RELIEF UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT

### I. STATEMENT OF THE CASE

This case involves an employer's discharge of prominent union supporters, along with other unfair labor practices, and most significantly, the imminent closure of that employer and planned distribution of all of its assets.  Ohio River Valley Environmental Coalition, Inc., (respondent) operates an environmental not-for-profit organization in Huntington, West Virginia.  Beginning in late 2020, respondent's six organizers and communications specialists created a labor organization called OVEC Union (Union).  Respondent responded by making several threats to an employee for assisting the effort, and ultimately suspending and discharging him, discharging another employee for a confrontational email exchange with a board member complaining about terms and conditions of employment, and disciplining a third employee for complaining about respondent's perceived anti-unionism.  Despite this conduct, the employees voted to be

represented by the Union, which was certified on July 19, 2021. [1]/ Respondent requested review from the Board, but the Board denied the request on September 28.

On October 7, the Region issued its third consolidated complaint alleging respondent's actions during the campaign violated the Act and setting a hearing date for December 13. On November 18, respondent advised the Region by email that its board of directors had voted to dissolve. Respondent also posted on its website its plans for dissolution and distribution of its funds to other non-profits, noting "OVEC's assets will be distributed to 501(c)(3) groups with similar missions, according to our bylaws and state and federal laws." On December 8, respondent's attorney, Sarah Walling, informed the Region by email that it was preparing plans for the distribution of its funds.

During a pre-hearing conference call with the ALJ, respondent confirmed its plans to dissolve, and gave a date of December 31. Respondent's counsel stated that they would not attend the December 13 unfair labor practice hearing, and indeed did not attend the hearing, but declined to withdraw the answer they filed to the complaint.

Respondent's counsel also declined the Region's repeated requests by phone and by letter sent December 9 to sequester funds to satisfy potential backpay liability, arguing generally that its by-laws, the West Virginia Non-Profit Corporation Statute, and the terms of its grants require it not do so. However, respondent provided no basis for those claims.

On December 16, the Region requested that respondent submit a position statement regarding the propriety of an injunction under Section 10(j) to secure assets in order to satisfy a backpay judgment, and renewed its request that respondent voluntarily escrow assets. Respondent did not respond by a December 17 deadline. However, on December 23, respondent's counsel advised

---

[1]/ All dates hereinafter are in 2021.

2

the Region in writing that respondent's board leadership confirmed to her that it is holding $50,000 in an account. Respondent, however, has declined to give any additional assurance that the sequestered funds will be utilized to satisfy any agreed upon settlement or final judgment of liability against respondent for the alleged unfair labor practices involved in these matters. While respondent's counsel warrants that no distribution of assets will take place before respondent's Board meets on January 8, there is no assurance given that respondent will not then immediately disburse funds, including the $50,000 currently held in an account.

Without an immediate injunction and grant of a temporary restraining order (TRO), Respondent's illegal actions will succeed in permanently thwarting the intent of Congress, the National Labor Relations Board's (Board) remedial authority, and the employees' statutory right to organize and collectively bargain with their employer in an effort to improve their terms and conditions of employment. Although the employees successfully organized and obtained representation, their victory appears to be pyrrhic with respondent's closure, and a TRO is needed to preserve the remaining potential remedy, the backpay award to which they may ultimately be entitled upon successful litigation or settlement of these matters.

The petition is brought under Section 10(j) of the National Labor Relations Act (the Act), 29 U.S.C. § 160(j), seeking to restrain respondent from violating Section 8(a)(1) and (3) of the Act and to order respondent to sequester sufficient funds, at least $50,000 to satisfy potential backpay liability. Such sequestration is necessary to prevent the complete dissipation of respondent's assets, thus frustrating the possibility of monetary remedial relief. Section 10(j) authorizes the Board to seek from the appropriate district court interim injunctive relief to preserve the status quo pending Board adjudication of unfair labor practices. District courts are further authorized by Section 10(j) to issue TROs in appropriate cases. This is such a case.

The petition is predicated on an administrative third consolidated complaint, issued after a complete investigation of unfair labor practice charges, (Exs. 1-5), [2]/ alleging that respondent has engaged in unfair labor practices. (Ex. 6) The Board may, after final adjudication of the complaint, prospectively order respondent to cease and desist from engaging in the unlawful activity and to, *inter alia*, reinstate the unlawfully discharged employees. However, the Board's process is lengthy, as the decision of the administrative law judge, once issued, is reviewable by the Board. In the meantime, respondent's alleged unlawful conduct creates a serious potential for irreparable harm to employees' organizational rights which a Board order, in due course, cannot adequately remedy. Accordingly, Petitioner seeks injunctive relief pursuant to Section 10(j) during the pendency of the Board's proceedings.

## II. STATEMENT OF FACTS

As noted, respondent is a 501(c)(3) not-for-profit grassroots environmental group dedicated to the preservation and betterment of communities and the environment. Respondent engages in community outreach, education, organizing, coalition building, leadership development, media outreach, and strategic litigation in order to achieve its goals.

Employees' Union Activity

In October 2020, employees Brendan Muckian-Bates and Alexander Cole met with a representative of the union via zoom to discuss the possibility of organizing the employees of respondent. Zoom meetings between interested employees and the union were held in October, November, and December 2020. By January, six employees had joined the organizing campaign. [3]/ The employees called their association the OVEC union, an affiliate of the

---

[2]/ "Ex." references are to the Exhibits attached to the Petition for Injunctive Relief Pursuant to Section 10(j) of the National Labor Relations Act.
[3]/ As of January, respondent had nine employees - three statutory supervisors, and six bargaining unit employees.

4

Industrial Workers of the World, whose members are colloquially known as the Wobblies. Around late February, employees Daniella Parent and Sarah Carballo informed respondent's Administrative Director Matt Spurlock of the ongoing organizing campaign. On March 2, during an all-employee zoom staff meeting, Spurlock announced to the staff, among other things, that he was aware of the organizing activity.

On April 26, the OVEC union filed a petition in Case 09-RC-276218 seeking to represent all non-supervisory employees employed by respondent, including community organizers, project coordinators, communication specialists, and the director of organizing (Muckian-Bates). A pre-election hearing was held on May 17 — the sole issue was whether the director of organizing, Muckian-Bates, was a statutory supervisor. On June 2, petitioner issued a Decision and Direction of Election finding that the director of organizing was not a supervisor within the meaning of Section 2(11) of the Act, and should be included in the petitioned-for unit. Following a mail ballot election, the union prevailed and was certified as the exclusive collective-bargaining representative of the petitioned-for unit on July 19. Thereafter, respondent filed a Request for Review specifically challenging petitioner's determination that the director of organizing was not a statutory supervisor. On September 28, the Board issued its Order denying the employer's request for review.

Alleged 8(a)(1) and Muckian-Bates' Suspension

In an all-employee zoom staff meeting on March 4, respondent's Executive Director Vivian Stockman was accompanied by Mike Forman, a member of respondent's Board of Directors. Forman advised the employees that the Board was aware of the organizing campaign, and said the staff meeting was called to find out why employees were organizing. After some discussion between Forman and employees about why they were organizing, and his thoughts

5

about the same, Forman addressed Muckian-Bates specifically. Forman threatened Muckian-Bates with unspecified reprisals when he said that if Muckian-Bates was involved in the campaign, he would have a lot of explaining to do because Forman understood him to be a supervisor.

One week later, Stockman invited Muckian-Bates to meet with her, Forman, and Will Edwards, another member of respondent's Board of Directors. In that meeting, Forman told Muckian-Bates that the Board of Directors found him to be a supervisor, that he was aware of Muckian-Bates' involvement in the organizing campaign, and that he and Edwards were there to ask him questions. Forman further warned Muckian-Bates that a failure to answer truthfully and accurately would result in his immediate termination. After Muckian-Bates requested to consult with legal counsel, Forman told Muckian-Bates that he was a supervisor and thus not protected by the Act, and informed him that he was not legally allowed to join a union and that if he participated in the organizing campaign, he would be in violation of his status as a supervisor. Forman further stated that if Muckian-Bates failed to cooperate, he would be fired. Muckian-Bates responded by stating he was not a supervisor and had not been acting in a supervisory capacity, at which point Stockman immediately placed Muckian-Bates on indefinite suspension.

On May 25, respondent implemented a new grievance procedure that created formal grievance procedures, time limits to file grievances, and outlined how grievances should be filed. The employer acknowledged making the alleged revisions to the grievance procedure solely to address the unionizing employees' complaints that they did not have an adequate forum or process to report perceived wrongdoing by management. [4]/

---

[4]/ The Region concluded that respondent's implementation of the revised grievance procedure was akin to a solicitation of grievances, and an implied promise to remedy those grievances, during an organizing campaign.

Muckian-Bates' Discharge

On May 29, respondent terminated Muckian-Bates' employment. Respondent did not deny that Muckian-Bates was terminated for his involvement in the nascent organizing campaign, but defended its actions on the grounds that Muckian-Bates was a supervisor and not protected by the Act.

Dustin White's Discharge

Dusting White was employed by respondent as a project coordinator/community organizer and was an active and known union supporter. On April 30, he sent an email to respondent's entire staff and Board of Director's acknowledging his support of, and active role in, the organizing campaign. Thereafter, on about May 6, White joined an email thread started by Robin Blakeman, a community organizer who, via this thread, announced her resignation. White sent several emails within this thread in which he opined that respondent's union busting and white dominant/supremacist culture and threats from Board Members led to a toxic work environment. When one of the Board Members asked to be removed from the thread, White wrote that if respondent and its Board wanted to ignore employee complaints of mistreatment, then those employees will "show up in spaces you are. That is organizing." On May 19, White also posted screenshots to his Facebook account of emails from Board Member Mike Forman.

On May 20, Stockman terminated White, purportedly because of the "adversarial email exchange" White had with members of respondent's management and the Board, and for displaying "open hostility and aggression" towards them. White's termination letter also identified the Facebook posts White made on May 19 about respondent's Board of Directors, which respondent considered false statements and the public disclosure of confidential information. While White's comments may have been confrontational and in some instances

insensitive, his comments and communications were not of the nature that would cause him to lose protection under the Act.

Alex Cole's Written Warnings

Like Muckian-Bates and White, employee Alex Cole was an active and known union supporter.  On June 1, respondent held a staff meeting to divide up the work left behind by White, Muckian-Bates, and Blakeman following her recent resignation.  During this meeting, discussion ensued about a particular project being worked on by Cole at that time.  Cole said the coalition he was working with was upset with respondent's termination of Muckian-Bates and were planning to kick respondent out because of the way it was treating its staff over the organizing campaign.  Cole was issued a warning letter on about June 2 for his statements and gestures (smirking) in the June 1 meeting, allegedly for disrespecting a member of respondent's management.  While Cole acknowledges making the statements and gestures attributed to him, they were not of the ilk that would cause Cole to lose protection of the Act.

On July 2, Cole was again issued a written warning for events that transpired on June 17.  On June 17, Cole met with respondent's Co-Executive Director Tonya Adkins and respondent's Administrative Director Matt Cochran, ostensibly to discuss Cole's ongoing projects.  During the conversation, Adkins brought up the union and the organizing campaign.  The participants discussed whether respondent was, in fact, pro-union as management claimed.  During this conversation, Cole stated that respondent was running off people under 40 and progressives because of its anti-union positions.  On July 2, Cole received a written warning for his statements in the June 17 meeting, allegedly for saying respondent's administration was too old and that he was going to seize power.  Similar to his conduct on June 1, Cole's statements were not of the kind that would cause him to lose protection of the Act.

### III. THE APPLICABLE STANDARDS UNDER SECTION 10(j)

Section 10(j) authorizes United States district courts to grant temporary injunctions pending the Board's resolution of unfair labor practice proceedings. Congress recognized that the Board's administrative proceedings often are protracted. In many instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint, and it could thereby render a final Board order ineffectual. [5] Thus, Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation. [6]

Section 10(j) directs district courts to grant relief that is "just and proper." In the Fourth Circuit, district courts rely on traditional equitable principles to determine whether interim relief is appropriate. [7] The Fourth Circuit requires that the petitioner show (1) a likelihood of success on the merits; (2) that irreparable harm is likely absent an injunction; (3) that the balance of equities tips in favor of injunctive relief and (4) that an injunction is in the public interest. [8] The traditional equitable criteria, including the threat of irreparable harm, should be considered in the context of the underlying purpose of Section 10(j), which is to preserve the Board's remedial powers [9] and protect the integrity of the collective bargaining process. [10]

A. Likelihood of Success

Petitioner, as Regional Director, makes a threshold showing of likelihood of success by producing "some evidence" in support of the unfair labor practice charge "together with an

---

[5] See, *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 543-44 (4th Cir. 2009). See also, *Scott v. Stephen Dunn & Assocs.*, 241 F.3d 652, 659 (9th Cir. 2001); S. Rep. No. 105, at 8, 27 (1947), *reprinted in* I NLRB, *Legislative History of the Labor-Management Relations Act, 1947*, at 414, 433 (1985)).
[6] See, *Muffley*, 570 F.3d at 543-44.
[7] *Muffley*, 570 F.3d at 541-42.
[8] *Henderson v. Bluefield Reg'l Hosp.*, 902 F.3d 432, 439 (4th Cir. 2018).
[9] *Henderson,* 902 F.3d at 439; *Muffley*, 570 F.3d at 543.
[10] *Scott*, 241 F.3d at 66, (quoting *Miller*, 19 F.3d at 459-60).

arguable legal theory." [11]/  In assessing whether the Regional Director has met this minimal burden, district courts must take into account that Section 10(j) confers no jurisdiction to pass on the ultimate merits of the unfair labor practice case and that, ultimately, the Board's determination on the merits will be given considerable deference.  [12]/  In a 10(j) proceeding, the district court should sustain the Regional Director's factual allegations if they are "within the range of rationality" and, "[e]ven on an issue of law, the district court should be hospitable to the views of the [Director], however novel." [13]/  Finally, the district court should not resolve credibility conflicts in the evidence.  [14]/

B. <u>Balancing the Equities and the Public Interest</u>

The public interest is an important factor in the exercise of equitable discretion.  [15]/ Section 10(j) implements the public interest to protect the Board's remedial power from compromise by the passage of time inherent in obtaining an enforceable Board order.  [16]/ Accordingly, in evaluating whether irreparable injury to the policies of the Act is threatened, as well as in balancing the hardships, the district court must consider whether declining to issue the injunction will permit the passage of time inherent in the administrative proceeding to cause "a very real—and potentially irreparable— harm to the effectiveness of the Board's eventual order." [17]/

---

[11]/ *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 460 (9th Cir. 1994) (en banc) (cited by *Muffley*, 570 F.3d at 541).
[12]/ See, *Bloedorn v. Francisco Foods, Inc*, 276 F.3d 270, 287 (7th Cir. 2001); *Miller*, 19 F.3d at 460, and cases there cited.
[13]/ *Bloedorn*, 276 F.3d at 287; *Danielson v. Joint Bd.*, 494 F.2d 1230, 1245 (2d Cir. 1974) (cited with approval in *Miller*, 19 F.3d at 460).
[14]/ See, *Scott*, 241 F.3d at 662; *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1570, 1571 (7th Cir. 1996).
[15]/ *Muffley*, 570 F.3d at 543. *See also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).
[16]/ See, *Muffley*, 570 F.3d at 544.
[17]/ *Muffley*, 570 F.3d at 544.

## IV. APPLICATION OF THE STANDARDS TO THIS CASE

A. There is a Strong Likelihood of Establishing that Respondent Violated the Act

There is a strong likelihood that the Board will find that respondent violated Section 8(a)(1) and (3) of the Act. Section 8(a)(1) makes it unlawful for an employer to "interfere with, restrain, or coerce employees in the exercise of their Section 7 rights." [18]/ Section 8(a)(3) makes it unlawful for an employer to retaliate against union activity. To establish a prima facie case of retaliation or discrimination under Section 8(a)(3), the evidence must establish that the employee was engaged in protected activity, the employer had knowledge of that activity, the employer showed animus related to that protected concerted activity, and the animus resulted in the adverse employment action taken by the employer. [19]/

Here, it is highly likely that the General Counsel will prevail on the merits. This likelihood only increased when respondent did not even appear to defend the allegations of the complaint at the administrative hearing held on December 13. The evidence adduced during the hearing and the investigations overwhelmingly establish the many 8(a)(1) violations, as well as respondent's repeated discussion of, and animus towards, employee union activities. Moreover, respondent admits it suspended and terminated Muckian-Bates for his involvement in the organizing campaign, and there is ample evidence to support the unlawful discharge of White, and the unlawful written warnings issued to Cole. Thus, while respondent claims that White and Cole were discharged and disciplined, respectively, for their interactions with respondent's Board members and managers it makes no allowance for the fact, obvious on the evidence, that

---

[18]/ 29 U.S.C. Sec. 158(a)(1).
[19]/ *Wright Line*, 251 NLRB 1083, 1089 (1980), *enforced,* 662 F.2d 899 (1st Cir. 1981), *cert. denied* 455 U.S. 989 (1982), *approved in NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983).

each was clearly engaged in protected activity under the Act when their purported misconduct occurred.

>   B. The Balance of Equities Favors Interim Injunctive Relief to Prevent Dissipation of the Employer's Assets and to Protect the Efficacy of the Board's Backpay Order

Congress has declared that "encouraging … collective bargaining" is the "policy of the United States." [20]/ Section 7 of the Act grants employees the decision "to bargain collectively through representatives of their own choosing." [21]/ Making that choice "without restraint or coercion" is a "fundamental right." [22]/ Without timely interim relief, respondent's illegal actions will irreparably harm the national policy encouraging collective bargaining, the employees' right to choose union representation, and the Board's remedial power. In short, respondent will forever benefit from its illegal conduct.

The Board's remedies are restorative, rather than punitive. Backpay, specifically provided for in Section 10(c) of the Act, is central to the Board's remedial efforts to restore the status quo. [23]/ There is therefore a critical need to protect the potential backpay remedy of the Board.

Federal courts have granted injunctions to preserve the assets of a defendant or respondent where those assets appeared to be in danger of dissipation during the pendency of federal administrative proceedings, including those of the Board. [24]/ For where, as here, there is

---

[20]/ 29 U.S.C. § 151.
[21]/ Id. § 157. *See NLRB v. Transportation Management Corp.,* 462 U.S. 393, 397 (1983)
[22]/ *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33 (1937). See also, *National Cash Register Co. v. NLRB,* 466 F.2d 945, 959 (6th Cir. 1972) ("the policy of the NLRA is to 'insulate employees' jobs from their organizational rights.'") (citing *Scofield v. NLRB,* 394 U.S. 423, 429 n. 5 (1969), quoting *Radio Officers' Union v. NLRB,* 347 U.S. 17, 40 (1954)).
[23]/ *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197 (1941); *NLRB v. J.H. Rutter-Rex Mfg. Co.*, 396 U.S. 258, 265 (1969).
[24]/ See, e.g., *Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243 (3d Cir. 1997); *NLRB v. Kellburn Mfg.*, 149 F.2d 686 (2d Cir. 1945); *Aldred Investment Trust v. SEC*, 151 F.2d 254 (1st Cir. 1945); *Aguayo v. Chamtech Serv. Ctr.*, 157 LRRM 2299, 2300-01 (C.D. Cal. 1997) (sequestration of assets TRO); *Jensen v. Chamtech Serv. Ctr.*, 1997 WL 351081, at *3-5 (C.D. Cal. 1997) (sequestration of assets and surety bond); *Kobell v. Menard Fiberglass Prods., Inc.*, 678 F. Supp. 1155 (W.D. Pa. 1988); *Schaub v. Brewery Prods., Inc.*, 715 F. Supp 829 (E.D. Mich. 1989); *Pascarell v. Alpine Fashions, Inc.*, 126 LRRM 2242 (D.N.J. 1987). See generally *Kemp v. Peterson*, 940 F.2d 110, 114 (4th Cir. 1991) (holding equity power gives court ability to freeze assets where it is shown absent the freeze

likelihood of success in proving that a respondent has engaged in unfair labor practices which ultimately will give rise to a remedial backpay order, and where there is evidence that the respondent is liquidating and/or dispersing its assets or threatening to do so, without providing for satisfaction of that future backpay liability, the issuance of an order under Section 10(j) of the Act enjoining the dissipating of assets, or sequestering assets, or directing the deposit of funds with the registry of the district court, or establishing a receivership, is clearly "just and proper"— indeed, is absolutely essential—to preserve the status quo and prevent the nullification or frustration of the Board's ultimate remedial order. [25]/

Respondent's actions indicate that there is a strong likelihood that they have been and will continue to dissipate assets quickly prior to closing at the end of the year or by early January 2022 if not precluded from doing so, resulting in immediate and irreparable harm to any potential backpay order. Respondent initially informed the Region it will distribute its assets to other non-profits and dissolve by the end of the year. It now appears on representation of counsel that this may not occur until at least January 8, 2022. There is, however, no reason to doubt respondent will do so and unjustifiably deny employees any opportunity to recover a backpay remedy. Respondent has also rejected the Region's repeated requests that it voluntarily sequester the funds needed for the potential backpay order. Although respondent has now stated that $50,000 has been set aside in an account, it has provided no information about the account or assurances as to how long the funds will remain and for what specific purpose they have been set aside despite the Region's requests that it do so. While in these circumstances, not preserving respondent's assets would cause immediate irreparable harm as it is likely that no assets will

---

order the assets would become unavailable); *SEC v. Am. Bd. Of Trade, Inc.*, 830 F.2d 431, 438-39 (2d Cir. 1987); *SEC v. Bartlett*, 422 F.2d 475 (8th Cir. 1970); *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir 1982); *FSLIC v. Sahni*, 868 F.2d 1096 (9th Cir. 1989).
[25]/ See generally, *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967).

exist by the time the administrative litigation before the Board and the courts concludes in this case, which will certainly not happen prior to the end of the year or even in January.

There is also no merit to respondent's assertion that it is prohibited from sequestering assets for its potential backpay liability. Respondent has failed to provide a copy of its bylaws or any evidence that the terms of its grants prohibit the paying of wages or backpay liabilities, and its 2019 tax returns indicate that a significant amount of its grant money went to wages and benefits. Moreover, nothing in the West Virginia Nonprofit Corporation Act supports respondent's actions. In fact, § 31E-13-1309(a) specifically states that when a nonprofit dissolves, all liabilities and other obligations are to be paid or adequate provision made for their payment.

In addition, the proposed order preserving assets would not unduly harm respondent. The proposed order would not interfere with any ongoing operations, since respondent is ceasing operation. Respondent would merely be precluded from dispersing assets without first ensuring the preservation of sufficient funds to satisfy their potential backpay obligation. The order would also not prevent respondent from selling any of its assets in arms' length transactions for a fair and present consideration. Nor would it proscribe respondent from incurring and paying legitimate, current business expenses. Rather, it would merely preclude respondent from dispersing or dissipating its assets or the proceeds of the sale thereof without first ensuring the preservation of sufficient funds to satisfy its potential backpay obligations. [26]/ This temporary deprivation of respondent's unfettered control over its property is consistent with due process standards. [27]/ In fact, any relief granted by the Court is temporary in nature and lasts only

---

[26]/ See, *Kobell v. Menard Fiberglass*, 678 F. Supp. at 1166-67; *Schaub v. Brewery Prods.*, 715 F. Supp. at 831.
[27]/ See, *generally Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 618-19 (1974); *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 288-90 (1940).

14

during the administrative litigation before the Board and the courts. [28]/ Finally, the order serves the public interest in holding the Employer accountable for its violations of the Act. [29]/

In sum, interim relief will vindicate the employees' statutory right to a free choice regarding unionization, preserve the Board's remedial power and serve the public interest by ensuring that the employer's unfair labor practices do not permanently succeed. [30]/

## V. CONCLUSION

There is a strong likelihood that Respondent unlawfully thwarted its employees' union activities. A Section 10(j) injunction is just and proper to prevent permanent harm to employees' rights to organize and preserve the effectiveness of the Board's final remedy. Accordingly, this Court should grant the injunctive relief in the petitioner's Proposed Order.

/s/ Daniel A. Goode
Daniel Goode  #0086855 (Ohio)
Counsel for Petitioner
Region 9, National Labor Relations Board
Room 3-111, John Weld Peck Federal Building
550 Main Street
Cincinnati, Ohio  45202-3271
Phone:  (513) 684-3678/Fax:  (513) 684-3946
E-Mail:  daniel.goode@nlrb.gov

---

[28]/ *Barbour v. Central Cartage, Inc.*, 583 F.2d 335, 337 (7th Cir.1978).
[29]/ See, *Frankl v. HTH Corp. (Frankl I)*, 650 F.3d 1334, 1365 (9th Cir. 2011) ("In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed….").
[30]/ See, *Pye*, 238 F.3d at 75 (Section 10(j) relief "is designed to prevent employers from using unfair labor practices in the short run to permanently destroy employee interest in collective bargaining."); *Frankl I*, 650 F.3d at 1365 ("In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed"); *Pan Am. Grain Co.*, 805 F.2d at 28 ("[T]he public has an interest in ensuring that the purposes of the Act be furthered.").